Gloria Yvette SMITH, Billy Mack Rountree, William Rosea Snoddy, and Dorothy Dews, each individually, and on Behalf of all Others Similarly Situated, Plaintiffs,

v.

NORTH AMERICAN ROCKWELL CORPORATION—TULSA DIVISION, formerly North American Aviation, Inc., Defendants.

Civ. A. No. 69–C–12.

United States District Court,
N. D. Oklahoma.

Feb. 25, 1970.

Waldo E. Jones, II, James O. Goodwin, Tulsa, Okl., David R. Cashdan, Equal Employment Opportunity Commission, Washington, D. C., for plaintiffs.

Gibson, Dunn & Crutcher, Los Angeles, Cal., Boone, Ellison & Smith, Tulsa, Okl., for defendants.

## DECISION

BARROW, Chief Judge.

### I

This is an action brought by plaintiffs against defendant North American Rockwell Corporation alleging that defendant has deprived plaintiffs of rights secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (hereinafter Title VII), and by the Civil Rights Act of 1866, 42 U.S.C. § 1981. In addition to relief on their own behalf, plaintiffs seek to represent as a class all persons similarly situated.

Defendant has moved to dismiss the Complaint or strike therefrom any reference to the Civil Rights Act of 1866, insofar as it purports to present a cause of action based on that statute, on grounds that the law is immaterial and impertinent with respect to this action and for failure to state a claim upon which relief can be granted. Such motions are based on Rule 12 of the Federal Rules of Civil Procedure. In addition, defendant moves to sever the respective claims of the four plaintiffs on the ground that they are improperly

joined under Rules 18, 20, and 21 of the Federal Rules of Civil Procedure.

Insofar as is properly necessary to reach the points raised by these pleadings, the present dispute arises out of the following facts.

Defendant is a large aerospace company which employed nearly 4,500 persons in its Tulsa Division at the time of the events alleged in the present Complaint. The company is organized into several separate divisions based on the type of work the unit is to perform. Among the divisions relevant to the allegations of the Complaint, are Management Planning and Finance, Laboratories, and Manufacturing. These divisions are further divided into departments.

Each of the plaintiffs was employed by the company in a different capacity and in a different department. Gloria Yvette Smith was hired on November 21, 1964 as a clerk-general (Job Code #7357, labor grade). She was originally assigned to Department 916 (Data Processing) and has remained in that department ever since. When Mrs. Smith was first hired her base rate of pay was $2.28 per hour. On March 8, 1967 she was promoted to the position of librarian-data processing (Job Code #2157, labor grade 4). As of October 1, 1967, her base rate of pay was $2.97 per hour.

During the period prior to October 1967, Mrs. Smith suffered a continuous physical disability which required several extended leaves of absence. Her condition was diagnosed in July 1965 as a tumor of the brain. An important question arises whether Mrs. Smith's condition substantially affected her ability to efficiently perform her work, and was responsible in part for her failure to advance as rapidly as she might have otherwise. Any evaluation of her progress must take into account her physical condition.

On January 3, 1969, the present Complaint was filed alleging that defendant discriminatorily refused to promote Mrs. Smith because of her race and color in violation of Title VII, and of the Civil Rights Act of 1866. Mrs. Smith seeks back pay and injunctive relief from the alleged discriminatory failure to promote.

Billy Mack Rountree was employed by the company on January 10, 1966 as a plastic-parts fabricator (Job Code # 5946). On March 3, 1966, Mr. Rountree was upgraded to plastic-parts fabricator (Job Code #5944, labor grade 6). A cutback in the number of employees in the plant resulted in a realignment of the work force, under which Mr. Rountree was transferred from Department 965 (plastics) to Department 970 (Experimental Development) on May 7, 1967. He remained in his classification of plastic-parts fabricator. Further reduction in the work force resulted in his downgrading to the position of drill operator and eventually to the position of identifier (labor grade 3). On June 3, 1967, Mr. Rountree was laid off for lack of work. During this period the size of the work force of the plant decreased from over 4,000 employees to approximately 3,300 employees.

Mr. Rountree filed the instant Complaint on January 31, 1969 alleging that he had been denied the opportunity to attend Blueprint School, based solely on his race, in violation of Title VII and the Civil Rights Act of 1866. Mr. Rountree seeks back pay and injunctive relief against the practices alleged in the Complaint.

The third plaintiff in this action, William Rosea Snoddy, began working for the company on August 26, 1963 as a messenger (Job Code #7997, labor grade 1). He received a series of promotions, finally reaching the position of analyst-research (Job Code #2057, labor grade 10) on July 10, 1966. Mr. Snoddy was assigned during this time to Department 939, which is the plastics unit in the Materials and Processes Laboratory. In

March 1967, Mr. Snoddy was among three employees considered for promotion to the position of associate-tests and development laboratory, but did not receive the promotion. He voluntarily terminated his employment on April 14, 1967.

On January 31, 1969, Mr. Snoddy filed the instant Complaint, alleging that defendant's refusal to promote him was an act of discrimination because of his race and color which violated Title VII and the Civil Rights Act of 1866. Mr. Snoddy seeks injunctive relief and back pay.

The final plaintiff in this action, Dorothy Dews, was employed by the company on June 10, 1963 in the position of clerk-accounting, junior (Job Code #7248, labor grade 2). On December 27, 1964 she was promoted to the position of clerk-accounting (Job Code #7248, labor grade 3), the position which she currently holds. Mrs. Dews has been assigned throughout her tenure with the company to Department 904.

Mrs. Dews has claimed that she was denied promotion in her department because of her race, color and sex. She also alleges that the company deliberately transferred her from one area to another to avoid promoting her. Mrs. Dews joins in the present Complaint alleging that she has been denied opportunity for promotion because of her race and sex. She also seeks injunctive relief and back pay.

1. *42 U.S.C. § 1981*

42 U.S.C. § 1981 states:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

The allegations attempting to establish the Civil Rights Act of 1866, 42 U.S.C. § 1981 as an independent jurisdictional ground cannot stand and are therefore to be struck from the Complaint.

■ There is no evidence or even any hint that the defendant acted or omitted any act under "color of state law." Absent any clear ruling by the United States Supreme Court to the contrary, the Court is constrained to preserve the long-standing general construction of 42 U.S.C. § 1981 as extending only to such actions, or omissions to act, under "color of state law." See, e.g. Lucom v. Atlantic National Bank of West Palm Beach, Florida, 354 F.2d 51, 55 (5th Cir. 1965) cert. den'd 385 U.S. 898, 87 S.Ct. 199, 17 L.Ed.2d 130, reh'g den'd 385 U.S. 984, 87 S.Ct. 498, 17 L. Ed.2d 445; Kendrick v. American Bakery Co., Civil No. 11490 (N.D.Ga.1968); Norman v. Missouri Pacific R.R., Civil No. LR 66–C–258 (E.D.Ark.1968), vacated and remanded on other grounds, 414 F.2d 73 (8th Cir. 1969); Culpepper v. Reynolds Metals Company, 296 F.Supp. 1232 (N.D.Ga.1968); Colbert v. H-K Corporation, 295 F.Supp. 1091 (N.D.Ga. 1968).

Several independent grounds also preclude the use of 42 U.S.C. § 1981 as a jurisdiction basis for this action.

First, to construe 42 U.S.C. § 1981 as supporting this Court's subject matter jurisdiction of the present controversy would make Title VII of the Civil Rights Act of 1964 a redundancy and in large part an absurdity. This Court cannot entertain any such construction of either statute. First, the Congress enacted as Title VII of the Civil Rights Act of 1964 what was generally heralded as the first effort by the United States Government to outlaw discrimination in private employment on the basis of race, religion, national origin and sex. The Congress devoted substantial time to the consideration of the provisions of the Civil Rights Act of 1964, and a significant portion of that consideration revolved around Title

VII and the question whether Congress could outlaw discrimination by private persons against other private persons in matters of employment. The House Judiciary Committee spent 22 days on the measure; 7 days were devoted by the House Rules Committee; 6 days were devoted by the House of Representatives itself; and the Senate of the United States spent a total of 83 days. Extended debate in the Senate lasted over 534 hours. United States Equal Employment Opportunity Commission, Legislative History of Titles VII and XI of the Civil Rights Act of 1964 11.

The debates in Congress specifically with respect to the then proposed prohibitions against discrimination in private employment reflect no hint that the Civil Rights Act of 1866 had already rendered private discrimination in employment unlawful and actionable in the Federal Courts. For example, the leading proponents of Title VII submitted legal opinions from distinguished American Constitutional lawyers, including the Deputy Attorney General, a wide range of private practitioners and law teachers, the Office of the Solicitor of Labor and the Bar Association of the City of New York. United States Equal Employment Opportunity Commission, Legislative History of Titles VII and XI of the Civil Rights Act of 1964 3075–3098. Not one of these authorities suggested that the apparently serious consideration given to the question of the constitutionality of the proposed Title VII was simply a charade in light of the fact that the substantive prohibitions of that Title had been a part of the law of the United States since a year after the close of hostilities in the Civil War. For example, the concluding paragraph of the memorandum presented on behalf of the Association of the Bar of the City of New York, and signed by a distinguished group of lawyers, clearly reflects the view that Title VII represented a new Federal prohibition for the first time outlawing discrimination in private employment as a matter of Federal law:

"The proposed legislation is responsive to a *need which has long been apparent* and which lies near the center of the current crisis in race relations: the right to seek, to find and to hold a job free from discrimination. We regard the objectives of the procedures of each of the proposed bills as well within the national power and their subject as one which is singularly appropriate for national action. While we believe that the Senate bill provides the more effective means for combating discrimination, either bill is adequate for this purpose, and, accordingly, we strongly recommend that the proposed civil rights legislation *include as part of its multiple attack on the problem of racial discrimination provision for equal employment opportunities along the lines of either one of these two timely bills.*" [Emphasis added]

> United States Equal Employment Opportunity Commission, Legislative History of Titles VII and XI of the Civil Rights Act of 1964 3090

One of the leading scholarly authorities on the subject of equal or fair employment, in what is perhaps the leading treatise on that subject, states the following view as to the position of Title VII in the regulation of employment discrimination:

"Equal employment opportunity measures have taken many forms, including, most recently, a federal statute. Title VII of the Civil Rights Act of 1964 is the first comprehensive equal employment opportunity law ever passed by Congress. * * *" Sovern, Legal Restraints on Racial Discrimination 8 (1966)

And again:

"Given the national and international dimensions of the problem, it is entirely appropriate that Congress at-

tempt to solve it. After over twenty years of deliberation on dozens of bills, Congress finally made that attempt in Title VII of the Civil Rights Act of 1964. Though it falls short of expectations in many ways, Title VII is at least a beginning, and depending on how a number of questions are resolved, it could prove much more than that." Sovern, Legal Restraints on Racial Discrimination 61 (1966)

The fact of this lengthy consideration would alone strongly suggest that the Civil Rights Act of 1964 represented novel Federal legislation with respect to equal employment opportunity. So does the plain absence of any hint, during such consideration, that the 1866 Civil Rights Act, including 42 U.S.C. § 1981, had made the proposed Title VII unnecessary.

Second, and as the product of the lengthy consideration and debate just described, the Congress enacted a statute which is in its own terms prospective in application: it was to be effective one year after its passage, and then only as to employers with more than 100 employees; the jurisdictional number of employees was thereafter to be reduced by 25 progressively at annual intervals until 3 years after the statute's effective date, when the statute was to reach its maximum scope and cover all employers having more than 25 employees. 42 U.S.C. § 2000e(b). This further manifests the novelty of the legislation.

Third, Title VII contains the following comprehensive description of unlawful employment practices, which goes well beyond any construction of 42 U.S.C. § 1981 which has been or in reason could be suggested to this Court:

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

42 U.S.C. § 2000e–2(a)

Any possible construction of 42 U.S.C. § 1981 which would make it otherwise applicable to the instant controversy thus runs afoul of the more comprehensive, later and thus in all events pre-emptive provisions of Title VII. See 42 U.S.C. § 1988, which suggests that later federal enactments must supplement, and where necessary replace earlier federal laws.

Fourth, the statute provides administrative investigation, conciliation and enforcement, as well as litigation in the United States District Courts, in an elaborate structure of procedures which evidences a statutory purpose favoring administrative investigation and conciliation—not merely litigation. This statutory purpose and the complicated combination of administrative action and litigation have both received widespread judicial recognition and approval. See e.g., Cunningham v. Litton Industries, 413 F.2d 887 (9th Cir. 1969), and cases cited therein. The claim as stated in the present action ventures into one of the most sophisticated and difficult areas which must be explored under the machinery of Title VII as enacted by Congress. Adjudication of the instant controversy requires a series of complex judgments and determinations whether employees each with different abilities, skills, qualifications and seniority in employment have been treated and judged by individual supervisors on a basis which does not involve their race. Each of the plaintiffs here was an employee with a different job, with different limitations, and different supervision, in different departments of the defendant corporation. Any construction of 42 U.S.C. § 1981 as a jurisdictional basis for

judicial decision in this complicated area of employment practices would be an insupportable avoidance of the evident purpose and meaning of Title VII of the Civil Rights Act of 1964 and particularly of the elaborate administrative and litigative machinery provided thereunder.

Fifth, unless the 1866 statute is eliminated from this case, litigation thereunder would require this Court to formulate an applicable period of limitations for causes of action, appropriate rules governing the scope of remedies, and standards of relevance for discovery proceedings and for defining the issues to be litigated. No guides to any such proposed judicial tasks have been developed in the more than 100 years of the existence of 42 U.S.C. § 1981 in its current and predecessor forms. Absent clear indication to the contrary, this Court cannot construe that 1866 statute as now requiring it to commence any such series of extraordinary judicial tasks.

The Court has considered with care Dobbins v. Local 212, International Brotherhood of Electrical Workers, 292 F.Supp. 413 (S.D.Ohio 1968), in which 42 U.S.C. § 1981 was permitted as a jurisdictional basis for a private civil action arising out of racial discrimination in employment and involving membership in a labor organization. Any reading of that case contrary to the instant opinion is disapproved. Moreover, this Court concludes it cannot itself properly extend any doctrines arising out of Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), to reach any result similar to that in Dobbins. Any such extension would ignore the differences in the language of Section 1981 and the section involved in the Supreme Court's decision in Jones, and would also ignore the specific history of Supreme Court decisions dealing with the subject of alleged discrimination in matters of employment. For example, in Colorado Anti-Discrimi-

nation Commission v. Continental Airlines, Inc., 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963), the Supreme Court in a unanimous decision reviewed extensively the scope of federal prohibitions against discrimination in employment. In confronting a question of whether a Colorado statute prohibiting such discrimination had been preempted by previous federal action in the same field, the Court reviewed numerous statutes and the Executive Orders of Presidents of the United States, but nowhere did it consider or suggest that private discrimination in employment had comprehensively been rendered unlawful by a provision of a statute passed in 1866. In fact, the Supreme Court did not refer to the Civil Rights Act of 1866 in that decision. A similar decision of the Supreme Court is Steele v. Louisville & N. R.R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), where the Court held that unions in the exercise of their congressionally granted authority as the exclusive bargaining representative for employees were precluded from invidious discrimination on account of race. There, the Court went to great lengths to infer such an obligation from the provisions of the Railway Labor Act, 45 U.S.C. § 151 et seq. None of this discussion would have been necessary or even relevant if the Court had been able to say that discrimination by any private agency, employer or labor union on account of race in any State in the Union had been unlawful and actionable since 1866.

The foregoing analysis compels this Court to order stricken from the plaintiffs' Complaint those portions which purport to base the jurisdiction of this Court upon 42 U.S.C. § 1981.

2. *Misjoinder of Parties Plaintiff*

In the present case, plaintiffs seek to represent a class composed of similarly situated persons, and have attempted to join in one action what are in reality four separate lawsuits arising out of four separate series of transac-

tions or occurrences involving four disparate sets of facts. In its present posture the case presents a variety of issues having little relationship to one another except for the fact that the same defendant is involved.

Under Rule 20(a) of the Federal Rules of Civil Procedure,

"[A]ll persons may join in one action as plaintiffs if they assert any right of relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action."

The rule states two requirements for proper joinder: (1) there must be a right to relief arising out of the same transaction, occurrence or series of transactions or occurrences; and (2) there must be a question of law or fact common to all of the plaintiffs which will arise in the action. Both these requirements must be satisfied. See Music Merchants' Inc. v. Capitol Records, Inc., 20 F.R. D. 462 (D.C.N.Y.1957); Philadelphia Dressed Beef Co. v. Wilson and Co., 19 F.R.D. 198 (E.D.Pa.1956); Rohlfing v. Cat's Paw Rubber Co., 99 F.Supp. 886 (D.C.Ill.1951).

In the instant case, neither of the two requirements for proper joinder under Rule 20(a) is present. First, the Complaint itself indicates that the transactions and occurrences on which it is founded are several, not joint; diverse, not the same. Second, even a cursory examination of the potential factual and legal issues here presented reveals that again there is no common ground among these plaintiffs.

■ The dissimilarity in transactions and occurrences claimed to render the defendant liable appears in the allegations in Paragraphs IV and VI of the Complaint and the supporting Record. For example, plaintiff Smith alleges that she was discriminatorily denied a pro-

motion in Department 916. Plaintiff Rountree complains of an entirely different occurrence, that he was discriminatorily denied an opportunity to attend Blueprint School. Mr. Rountree was employed in an entirely different capacity than that of Mrs. Smith. Mr. Rountree was subject to a collective bargaining agreement; Mrs. Smith was not. Again, plaintiff Snoddy's complaint arises out of a separate and distinct transaction. He complains that he was discriminatorily denied a promotion in the Materials and Processes Laboratory. Finally, plaintiff Dews complains that she was discriminatorily denied a promotion in the accounting department.

■ The general notion that there may have been denials of promotion in at least three cases cannot support joinder, where any purported denials of promotion would have been made by different supervisory personnel in different labor union and work environments, with respect to employees performing different types of work.

Moreover, litigation of even any purported general policy of defendant, as it might affect each plaintiff here, would inevitably focus in detail on the separate work histories of each plaintiff. On its face it would be practically impossible to litigate fairly and efficiently in one lawsuit all of the factual and legal issues which the present plaintiffs seek to raise. It would be unnecessarily burdensome and time-consuming for all the parties to do so. The determination of facts and scope of testimony, and defenses relating thereto, with respect to one plaintiff would have little relevance to issues raised by another plaintiff. Instead, there would be an evaluation of the administration of varying company rules by different supervisory personnel in different departments all in the context of dissimilar job functions. Such assessment would require a most precise and careful weighing of individual motives within quite different contexts. For instance, plaintiff Smith questions whether

her physical capabilities prevented her from adequately performing her job. Her claim must be examined in light of her long and serious illness. This is relevant to her claim of discrimination in Department 916, but not to the issue of the relative educational qualifications of plaintiff Dews as against other employees in her job classification in Department 904. Plaintiff Rountree questions whether he was denied an opportunity to attend Blueprint School on illegally discriminatory grounds. This raises issues with respect to his qualifications as compared with other candidates, and as compared with those actually attending Blueprint School; with respect to the seniority system as applied to the selections made, if any; and with respect to the entire method of selection. Plaintiff Snoddy's action must turn largely on his qualifications, if any, for promotion to the particular job or jobs open to him in the Test and Development Laboratory. Such analysis would likely include exploration of the relative merits of an education emphasizing biological science versus an education emphasizing chemistry as qualifications for the position desired. Only in an ultimate and abstract sense do the allegations of the Complaint share anything in common: all deal with purported racial discrimination in employment. On the immediate and practical level, which must govern the application of Rule 20(a), plaintiffs separately question their treatment by those persons who act, and have acted, as their supervisors.

It is of the highest importance that the practical impact of the joinder issue on the adjudication of each plaintiff's claim be clear. Who would be deposed as to the issue of allegedly discriminatory exercise of supervisory discretion? Who would be witnesses? What evidence would be heard? What would be the order of proof? In practical effect, there would inescapably be as many separate lawsuits as parties plaintiff. The disadvantage would be, however, that each would be heard end-to-end, and each party would await the hearing of evidence as to all others.

The following figures should place in context the importance of the question of joinder as it affects sound judicial administration and the interests of all parties. On December 31, 1968, in defendant's Tulsa Division, there were over 300 employees at the supervisory level. These persons oversaw on that date the work of nearly 4,500 individuals. How many of these persons may be called as witnesses to prove or disprove—by circumstantial evidence—the existence of a purported pattern of discriminatory exercise of supervisory discretion? Clearly, if this was all that was needed to resolve the litigation between each plaintiff on the one hand and the defendant on the other hand, a drastic expansion of this lawsuit might be called for. Careful analysis reveals, however, that no such expansion is appropriate. If discrimination of the forbidden type exists its impact at the supervisory level on each plaintiff will be shown by proof that the plaintiffs' respective supervisors have discriminated illegally as between them and the employees directed by such supervisors who do not belong to minority groups. This is precisely the same proof that would be required in separate actions brought by each plaintiff.

Given the foregoing analysis, it seems quite clear that in any practical sense there is no common occurrence or transaction among the plaintiffs, and that joinder of these plaintiffs in a single action is therefore improper on that ground. This principle has been applied in numerous cases. *See, e.g.,* Rohlfing v. Cat's Paw Rubber Co., *supra,* in which several number of plaintiffs sued several defendants for price discrimination. The Court held that there was misjoinder of plaintiffs, stating:

"It is clear that the injury to each plaintiff must be premised on individual facts arising between the plaintiff and defendant, that this injury to the

plaintiff could arise solely from circumstances of this relationship with the defendants. While the rule provides that a plaintiff 'need not be interested in obtaining * * * all the relief demanded', such right to relief must arise from the same transaction or series of transactions in which all the joined parties were engaged with the defendants." Rohlfing v. Cat's Paw Rubber Co., 99 F.Supp. 886, 894.

■ In addition to the absence of any common occurrence or transaction, there is likewise no indication that, within the meaning of Rule 20(a), some "question of law or fact common to all of the plaintiffs will arise in the action in order to make joinder proper." It is, of course, true that plaintiffs have alleged against defendant claims based upon the same general theories of law, but this is not sufficient. Whether a defendant unlawfully discriminated against one plaintiff with respect to promotion or job assignment in a given department is not common with the question whether defendant unlawfully discriminated against another plaintiff in a separate department. The second act constitutes separate, albeit similar, conduct. *See:* Federal Housing Administrator v. Christianson, 26 F.Supp. 419 (D.C.Conn.1939). It is thus clear that the various Complaints are independent. As indicated, the factual and legal questions between the plaintiffs and the defendant are based wholly upon the separate acts of the defendant with respect to each plaintiff. There is consequently a complete lack of common questions of fact or law, the second element required by Rule 20(a), and the action must be severed on this ground as well.

3. *Class Action*

In this action plaintiffs sue "on their own behalf and on behalf of other persons similarly situated pursuant to Rule 23(b) (2) of the Federal Rules of Civil Procedure" and propose to define the rep-

resented class as "Negro persons who are employed, or might be employed by [Defendant] as its plant located in Tulsa, Oklahoma, who have been and continue to be or might be adversely affected by the practices complained of" in the Complaint. Complaint at 1, 2.

■ First, a class action must proceed within the bounds of the issues properly raised by the plaintiff or plaintiffs representing the class. With respect to the present litigation, those issues raised during the proceedings before the Equal Employment Opportunity Commission delineate the scope of the issues which may properly be raised in the subsequent lawsuit. The issues properly raised here, then, are the same as those stated in the original Charges of Discrimination filed with the Commission. They are limited to the questions of discrimination in promotion and training in the respective departments of the plaintiffs as raised in those Charges. Any attempt at this point to state a class encompassing issues beyond those considered by the Equal Employment Opportunity Commission would be improper.

As stated in Oatis v. Crown Zellerbach Corporation, 398 F.2d 496 (5th Cir. 1968), with respect to the proper limits of a class action under Title VII of the Act:

"First, the class action must * * * meet the requirements of Rule 23(a) and (b) (2). Next, the issues that may be raised by plaintiff in such a class action are *those issues that he has standing to raise (i.e., the issues as to which he is aggrieved, * * *.), and that he has raised in the charge filed with the EEOC pursuant to § 706(a). * * *"* [Emphasis added] Oatis v. Crown Zellerbach Corporation, 398 F.2d 496, 499 (5th Cir. 1968).

■ Second, the range of issues involved in this lawsuit with respect to the present plaintiffs already exceed manageable bounds and has required

severance of parties plaintiff. It would clearly be inconsistent with this result for these plaintiffs to be allowed to bring an action on behalf of some single class of persons whom they all purported to represent. Rather, each plaintiff must now bring a separate action, based upon a Complaint duly and separately filed. However, as suggested by the foregoing analysis, each plaintiff may represent in such action that class of employees which is properly alleged under Rule 23 of the Federal Rules of Civil Procedure as construed by the Court in Oatis v. Crown Zellerbach Corporation, 398 F.2d 496, 499 (5th Cir. 1968).

In reaching this result, the Court is mindful that class actions have been maintained under Title VII in some cases. But in those cases, the class has been limited to individuals raising the same claims as are stated by the representative plaintiff. For instance, in Oatis v. Crown Zellerbach Corporation, *supra,* the Court indicated that employees not having filed charges before the Equal Employment Opportunity Commission should be allowed to join in the class action because "it would be wasteful, if not vain, for numerous employees, all with the *same grievance,* to have to process many *identical complaints* with the EEOC". One grievance mentioned by the Court in that case was the purported existence of segregated locker rooms. In Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968), the Complaint alleged systematic denial of promotion to a single, specific position. Finally, in Antonopulos v. Aerojet-General Corp., 295 F.Supp. 1390 (D.C.Cal.1968), a class action was brought by six women, all of whom were janitors and all of whom, with one exception, were discharged on the same day.

## ORDER

By reason of the foregoing decision, and the findings of fact and conclusions therein contained, it is hereby ordered that judgment be entered striking from the Complaint any references to 42 U.S. C. § 1981 insofar as plaintiffs have sought to base a cause of action on that statute, severing into four separate causes of action the claims stated by each plaintiff herein, and leaving open to each plaintiff herein the right to allege a cause of action on behalf of any class of persons which each such plaintiff may separately represent under Rule 23 of the Federal Rules of Civil Procedure. Each plaintiff shall have 30 days from and after the date of this Order within which to file a separate Complaint stating a cause of action based upon transactions and occurrences which have been the object of the Complaint herein.

Let judgment be entered accordingly.